**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LYNN SANCHEZ, an Individual,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 16 C 6983** |
| ) | |
| **CATHOLIC BISHOP OF CHICAGO, and** ) | **Judge Rebecca R. Pallmeyer** |
| **ARCHDIOCESE OF CHICAGO,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>

In 2014, Plaintiff Lynn Sanchez worked as a parish assistant for Defendants Catholic Bishop of Chicago and Archdiocese of Chicago. Defendants terminated her employment in November of that year, ostensibly because she engaged in unprofessional conduct by yelling, swearing, and spitting at her supervisor. Plaintiff claims she was terminated because she complained about another worker's viewing pornography on an office computer, meaning that her termination violated the anti-retaliation provisions of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq*. The court denied Defendants' motions to dismiss and for summary judgment, and the case proceeded to trial in November 2017. The jury found for Plaintiff and awarded her $700,000 in compensatory and punitive damages. Defendants now move for judgment as a matter of law, or, in the alternative for remittitur. For the reasons explained below, Defendants' motion is granted in part and denied in part.

<u>**BACKGROUND**</u>

In ruling on a Rule 50 motion for judgment as a matter of law, "the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). Credibility determinations and the weighing of evidence are reserved for the jury. *Id*. (citing, among other cases, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000)). The following account is

drawn from the parties' admissions and the evidence presented at trial, construed in that light.

Defendant Catholic Bishop of Chicago is a corporation sole affiliated with Defendant Archdiocese of Chicago, an archdiocese of the Roman Catholic Church. (Defs.' Answer to Pl.'s First Am. Compl. (hereafter "Answer") [28], at ¶¶ 5-6.) The entities own and operate Immaculate Conception and St. Joseph parishes in Chicago's Old Town neighborhood.

Plaintiff Lynn Sanchez began doing volunteer work for Defendant Archdiocese of Chicago in approximately 1998. (Answer ¶¶ 7-8.) Through this volunteer work, Sanchez met Mark Besztery, the business manager of Immaculate Conception and St. Joseph parishes. (*Id.* at ¶¶ 9-10.) In or around January 2014, Besztery hired Sanchez to work as a full-time Parish Assistant at the Immaculate Conception and St. Joseph parishes. (*Id.* at ¶ 7; Trial Transcript (hereafter "Tr.") 238:8-13.)

At all times relevant to this case, Defendants contracted with a company called MayDay Solutions to provide information technology (IT) services at Immaculate Conception and St. Joseph parishes. (Tr. 41:17-23; 183:12-17.) MayDay Solutions is owned by a parishioner named Cherie May. (*Id.* at 184:5-9.) One of MayDay's employees, a man named Harry Castaldo, frequently worked onsite at Immaculate Conception. (*Id.* at 185:8-186:7.) According to Sanchez, Castaldo "spent a lot of time on the third floor in the parish offices in the computer room." (*Id.* at 186:12-14.)

## I.    The Pornography

In late March or early April 2014, only a few months after Sanchez began working at the parishes, she walked into the computer room and found Castaldo sitting at a desk, with his back to the door, facing a desktop computer. (*Id.* at 187:8-12.) The computer's monitor was visible from the doorway, and when Sanchez entered the room that day, the "entire screen" was filled with "nude women in motion." (*Id.* at 187:12-17.) She stopped in the doorway, "shocked," and stood there silently for approximately five seconds. (*Id.* at 189:15-20.) At that point, Castaldo turned around and made eye contact with Sanchez. Neither he nor Sanchez said anything, and

Sanchez immediately left the room and walked back to her desk. (*Id.* at 189:22-23.) She says she did not report the incident to anyone that day because "I didn't believe what I saw . . . . It was just so shocking." (*Id.* at 190:3-4; 242:15-25.)

Approximately two weeks later, on Friday, April 11, 2014, Sanchez walked into the computer room to use the paper cutter. (*Id.* at 190:8-19.) She again found Castaldo sitting at the desk with his back to the door, and she again observed "what appeared to be a video of nude women on the screen." (*Id.* at 190:19-22; 243:8-13.) She stood in the doorway silently for five to ten seconds before Castaldo "changed the screen" and turned around. (*Id.* at 191:21-24; 243:14-19.) Neither she nor Castaldo said anything, and Sanchez "did what [she] had gone in there to do" (that is, she used the paper cutter) and then left the room. (*Id.* at 191:25-192:1.) She remembers thinking "okay, you're not crazy. That's what you saw. That confirmed the sighting of two weeks prior." (*Id.* at 192:3-5.)

## II.    The Initial Complaint

This time, Sanchez decided to report the incident. The Archdiocese's personnel manual includes a policy on reporting, and responding to, allegations of sexual harassment. This section states, in relevant part, that "[i]f any employee believes that he or she has been subjected to conduct which may constitute sexual harassment, that employee shall immediately report the offensive conduct to his or her immediate supervisor." The supervisor then must "report the allegation to the Pastor, Principal or Director, who shall then report the allegation to the Office of Employee Services and/or the Office of Legal Services." (Pl.'s Tr. Ex. 3, Ex. 13 to Pl.'s Resp. Br.)

When Sanchez got back to her desk, she "immediately" sent a text message to Mark Besztery stating "Harry is in his office—I didn't know and I just walked back there. Don't look now. but I think he's on a porn site." (*Id.* at 69:3-71:24; Sanchez-Besztery Text Messages, Ex. 9 to Pl.'s Resp. Br.) "Come on," Besztery responded. (*Id.*) "He's a strange guy," Sanchez continued. (*Id.*) "I agree," said Besztery. (*Id.*) The text exchange ended there, but a few minutes later, Sanchez went to Besztery's office to discuss the matter further. (Tr. 193:16-17.) She told

Besztery that she "saw nude women in motion" on Castaldo's computer screen, that a similar incident had occurred two weeks earlier, and that she was "disgusted." (*Id.* at 194:3-9; 246:16.) After "several minutes," Besztery told Sanchez he would report the incidents to "Father Larry [Lisowski]," who was "in charge of the whole parish." (*Id.* at 41:9-13; 73:14194:1, 24-25.)

Sanchez then returned to her office, expecting that Besztery "was going to do what he should do, which is to report it up the chain of command and tell Father Larry about it." (*Id.* at 195:4-6.) Approximately one hour later, Besztery and Father Larry spoke with Sanchez about the incident in a common area of the building. (*Id.* at 195:8-13; 73:1-3.) At Besztery's request, Sanchez told Father Larry about her encounters with Castaldo. (*Id.* at 196:4-8.) Father Larry responded with "very specific questions, like, did these women have anything on at all? What were they doing?" (*Id.* at 196:10-11.) Three times, Sanchez "repeated" to Father Larry that she saw "exposed female bodies in motion." (*Id.* at 196:12-14.) After four or five minutes, Father Larry said "I don't want to hear any more . . . Mark will handle this," and walked away. (*Id.* at 197:2-3.) At trial, Father Larry admitted that he "told [Besztery] to investigate what happened" instead of reporting Sanchez's allegation to "HR" or to "Legal." (*Id.* at 370:17-371:3.)

## III.    The Investigation

At some point, either later that afternoon (Friday) or the following Monday, Besztery and Sanchez had another conversation. (*Id.* at 198:7-8.) Besztery told Sanchez that, on Tuesday or Wednesday of that week, he "was going to meet with Cherie [May] and Harry"—that is, with Costaldo and his supervisor from MayDay Solutions—"and go over the network computer with them to see what was there." (*Id.* at 198:17-19.) Around 5:00 p.m. on Monday, however, Sanchez saw Harry and Cherie enter the computer room, without Besztery, and close the door. (*Id.* at 201:1-7.) The door was still closed forty minutes later when Sanchez left for the night, and she assumed that Harry and Cherie were still in the room. (*Id.* at 201:8-13.) Sanchez was "very

curious and suspicious," so she texted Besztery[1] and told him that "Cherie and Harry are here. They just came in, and they are behind closed doors in the computer room." (*Id.* at 201:16-25.) "That's strange," Besztery responded. "They were supposed to meet me there in the morning." (*Id.* at 202:1-3.)

Later that week, on either Tuesday or Wednesday, Sanchez went to Besztery's office to discuss the results of his meeting with Cherie and Harry. (*Id.* at 202:12-14.) Besztery told her that the meeting never happened, but that Cherie had provided him with a "log" showing that "there were no porn sites viewed" on the computer Harry had been using. (*Id.* at 203:2-13.) Besztery also reported that Cherie told him "there was a firewall" and "no one could have gotten through the firewall to pornographic websites." (*Id.* at 203:23-15.) "Come on," Sanchez responded. "You're talking about the very people who built this network, who know this network inside and out . . . . [H]ow could you say they couldn't do anything they wanted with this computer—with our network?" (*Id.* at 204:3-7.) The computer room "should have been cordoned off," she told him. "The computer should have been shut down, and you should have had someone, a third party, come in and conduct an investigation and review of our systems." (*Id.* at 204:18-21.) Sanchez told Besztery that she was "very concerned . . . because there were young children—this was a campus—and female teachers and principals and that this wasn't right." (204:24-205:2.) Besztery's response simply repeated what he had already told her: "We investigated it. There is a firewall, and there is nothing in the log." (*Id.* at 205:5-8.) He also told Sanchez that she and Harry "would no longer be allowed to be alone together." (*Id.* at 205:11-12.)

---

[1]    At trial, Sanchez testified that she no longer has a copy of this text message because "I didn't save any text messages. I pretty well delete them after I read them." (Tr. 202:5-9.) As far as the court can tell, Sanchez never explained why or how she was able to obtain copies of her text messages with Besztery from Friday, April 11, 2014, but not this exchange that purportedly occurred three days later. (*Compare* Ex. 9 to Pl.'s Resp. Br. (April 11 text messages with Besztery), *with* Tr. 247:11-15 ("Q. And those text messages that you testified you exchanged with Mark Besztery, they're nowhere to be found, correct? A. I didn't save any text messages, and apparently his were deleted.").)

## IV.     The Termination

Over the next several months, Sanchez complained to Besztery "every couple of weeks" about what she characterized as retaliation for her report on Harry's behavior. (*Id.* at 207:7-208:3.) Her IT support was "diminishing," she told Besztery, because she now had to contact Cherie for help and Cherie had become "very aloof." (*Id.* at 206:12-23.) On multiple occasions, Sanchez suggested to Besztery that the parish "look for another IT company, because this isn't right. We don't know what happened. They shouldn't have gone in and done their own investigation of the computer." (*Id.* at 208:4-7.) Besztery repeatedly urged Sanchez to "let it go, let it go." (*Id.* at 209:1-2.)

On Friday, November 7, 2014, Sanchez went to Besztery's office and told him that she "just couldn't work like this any longer, that it wasn't right . . . that he never did a proper investigation, that--and that things had been swept under the carpet[.]" (*Id.* at 217:24-218:3.) Besztery responded that Sanchez was "on a witch hunt," that she "needed to let it go," and that "there was an investigation, there's nothing there, there's a firewall." (*Id.* at 218:6-15.) He then told Sanchez that he "had to go meet his wife and kids," and asked her to call him over the weekend to discuss the matter further. (*Id.* at 219:20; 221:1-11.) As they discussed a date and time for the call, she followed him down the hall, into the elevator, and to the building's exit. (*Id.* at 289:1-6.)

At trial, Besztery testified that Sanchez was "in a rage" during this conversation. (*Id.* at 158:1-2.) She was "yelling and screaming . . . saying the F word at least 20 times," and "spit was flying out of her mouth." (*Id.* at 157:11-25.) He "felt threatened by her demeanor"; when he tried to leave she "grabbed" his shoulder. (*Id.* at 157:19-158:1.)

Sanchez testified that she never touched Besztery and did not swear or spit at him. (*Id.* at 218:16-219:11.) She acknowledged raising her voice during the conversation, but she said that Besztery raised his voice as well. (218:25-219:5.) She also testified, and Besztery admitted,

that both he and Father Larry themselves "occasionally" used profanity around the office.  (*Id.* at 114:21-116:3.)

On Sunday, November 9, Sanchez called Besztery on his cell phone.  She told him that she "felt like [she] was being retaliated against" and "couldn't do her job."  (*Id.* at 222:12-13.)  She also said that "this has all been swept under the carpet" and "something's got to give."  (222:24-225:1.)  Besztery responded that "if you can't let this go, you can turn in your keys on Monday."  (*Id.* at 223:5-6.)  Sanchez told him that she had contacted a lawyer, and Besztery said "I knew it."  (*Id.* at 223:9-11.)  At trial, she acknowledged that she again raised her voice during this conversation, but she denied using profanity.  (*Id.* at 223:12-16.)

At some point the next day, November 10, Besztery spoke by telephone with Kim O'Donoghue, a human resources field representative with Defendant Archdiocese.  (*Id.* at 298:13; 303:22-304:1.)  Besztery told O'Donoghue that Sanchez had "followed him around, she had cursed at him, she dropped f-bombs, she made physical contact with him."  (*Id.* at 304:2-6.)  O'Donoghue and Besztery then participated in a conference call with Fred Van Den Hende, the Archdiocese's Director of Human Relations.  (*Id.* at 304:13-15.)  During this phone call, Besztery again described his interactions with Sanchez on November 7 and 9.  (*Id.* at 304:16-18.)  He also mentioned that Sanchez had complained about an IT contractor viewing pornography on a parish computer, but that the network's firewall would have prevented this.  (*Id.* at 305:4-10.)  O'Donoghue's handwritten notes from the calls with Besztery and Van Den Hende included the following text: "she is threatening 'going public' w\ Harry."  (O'Donoghue Notes, Ex. 22 to Pl.'s Resp. Br.; Tr. 308:10-309:16.)

That same day, November 10, Sanchez came to work as usual and performed her "regular duties" all morning.  (Tr. 223:24-224:4.)  In the early afternoon, Besztery asked Sanchez to speak with him and Father Larry in a conference room.  (*Id.* at 224:4-11.)  At that meeting, Besztery told Sanchez that her employment was being terminated for two reasons: (1) because of her unprofessional conduct during her conversations with Besztery on November 7 and 9, and (2)

because she lacked the "skill-set to handle what needs to be done." (Audio Transcript 2-3, Ex. 16 to Pl.'s Resp. Br.) Sanchez responded that this was the first time she had heard anything about her purported lack of skills or poor work performance. (*Id.*)

On November 11, Besztery wrote an e-mail to O'Donoghue describing the previous day's "exit interview" with Sanchez and Father Larry. This e-mail stated that Sanchez had been terminated "based on her unprofessional and inappropriate behavior on Friday, November 7th and Sunday, November 9th plus her lack of skills, knowledge, and ability to complete her job responsibilities." (Besztery E-mail, Nov. 11, 2014, Ex. 17 to Pl.'s Resp. Br.) O'Donoghue responded later that day with the following message: "Mark – per your conversation yesterday, Lynn [Sanchez] was terminated for her insubordinate behavior, use of profanity when speaking to her supervisor, and physically grabbing your arms." (O'Donoghue E-mail, Nov. 11, 2014, Ex. 17 to Pl.'s Resp. Br.) At trial, Plaintiff's counsel asked O'Donoghue to explain why she did not mention anything about Sanchez "lacking the skill set to do her job" in this e-mail. O'Donoghue replied, "That was not her reason for termination." (Tr. 322:21-323:3.)

Father Larry Lisowski also wrote a memorandum describing the November 10 meeting with Sanchez. That memo stated that she had been terminated "due to her recent inappropriate behavior and poor performance." (Lisowski Memo., Nov. 11, 2014, Ex. 19 to Pl.'s Resp. Br.) At trial, Lisowski explained that he mentioned "poor performance" in the memorandum because "it was mentioned at [the November 10 meeting with Sanchez]," but that "[t]he decision for why she was terminated was her insubordinate behavior to her supervisor, Mark [Besztry]" on November 7 and 9. (Tr. 379:2-24.)

V.    **The Aftermath**

In the wake of Plaintiff's termination, she felt "untethered" from and "let down" by the church of which she had been a member for nearly twenty years. (*Id.* at 233:14-24.) She "didn't feel as secure" and became "untrusting of the church," which caused her "anxiety and pain." (*Id.* at 234:4-19.) She also became estranged from the community in which she had long been an

active participant. "[I]t's a small parish and people talk and there's gossip," Plaintiff testified at trial. She "presume[d] people knew what happened—found out or heard what happened," and she "felt embarrassed" and "kind of withdrew from some friendships [she] had there." (*Id.* at 235:1-8.)

Florence Denby, another parishioner at Immaculate Conception who had known Sanchez for approximately 14 years, testified that, prior to Plaintiff's termination, Sanchez had been an active participant in mass—"she didn't just sit there and gaze into outer space"—and that volunteering for the church had been "a big part of [Plaintiff's] life." (*Id.* at 456:3-14; 457:8-25.) Sanchez seemed "very excited when she first got hired" by the church, Denby recalled. (*Id.* at 458:20-23.) After Plaintiff told Denby about her termination, at some point in 2014, Denby observed that Sanchez seemed to feel "very bad" and became "less trustful of people in a superior position." (*Id.* at 460:14-25; 462:14-20.) Denby also testified, however, that she did not think that Plaintiff's "faith has been compromised." (*Id.* at 462:20.)

Plaintiff's husband of fifty years, David Sanchez, testified that Plaintiff's "mood changed considerably" after her termination. (*Id.* at 467:12-16; 471:22.) "She started eating more; she gained weight," he recalled. (*Id.* 371:22-23.) She "had a lot of fitful nights of sleep" and "slept more in the daytime" than she had in the past. (*Id.* at 471:24-472:2.) Plaintiff had previously been "very active, high energy," but it became difficult to "motivate her" after her termination. (*Id.* at 473:9-15.) She stopped going to mass, stopped volunteering at the church, and stopped babysitting for the children of other parishioners. (*Id.* at 472:24-473:2; 474:2-4.) Although she worked elsewhere for at least some period of time after her termination (*id.* at 479:13-19), she still "hasn't really snapped out of it" and was "not working" as of November 2017. (*Id.* at 475:23-476:2.) Even three years later, David explained, she has "good days and bad days . . . . It's kind of like having a rock in your shoe and you can't get it out, you can't—you just can't get comfortable." (*Id.* at 476:3-6.)

## VI.    The Lawsuit

Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission and initiated this action on July 5, 2016, within 90 days of receiving a right-to-sue letter from the EEOC.  (Answer ¶ 36.)  In Count I of her First Amended Complaint, filed on February 23, 2017, Plaintiff alleged that Defendants retaliated against her for complaining about unlawful sex discrimination and retaliation, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*  Count II asserted the same claim under the Illinois Human Rights Act, 775 ILCS 5/2-101, *et seq.*

The court denied Defendants' motions for dismissal and for leave to file a motion for summary judgment, both of which argued that, as a matter of law, internal complaints about a coworker viewing pornography at work do not qualify as protected conduct for purposes of a retaliation claim.  (*See* Minute Order Oct. 5, 2016 [19] (denying motion to dismiss); Transcript of Proceedings, Oct. 5, 2016 [37], at 4-5 (explaining rationale for denial of motion to dismiss); Transcript of Proceedings, June 1, 2017 [47], at 5-7 (warning Defendants that rehashing the same arguments in a motion for summary judgment would likely be futile); Transcript of Proceedings, July 25, 2017 [44], at 9-10 (same); Minute Order Aug. 17, 2017 [56] (denying, after full briefing, Defendants' motion for leave to file motion for summary judgment)).  The case then proceeded to trial.  Before the jury began deliberating, Defendants moved for judgment as a matter of law [84] on two grounds: (1) Plaintiff did not engage in protected activity, and (2) there was no causal connection between Plaintiff's alleged protected activity and any adverse employment action. After the jury returned a verdict for Plaintiff, awarding her $200,000 in compensatory damages and $500,000 in punitive damages (*See* Jury Verdict [90]), Defendants filed a Renewed Motion for Judgment as a Matter of Law, or in the Alternative for Remittitur [102].  That motion is now before the court.

<u>**DISCUSSION**</u>

**I.     Judgment as a Matter Of Law**

The court may enter judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FED. R. CIV. P. 50(a)(1), (b)(3).  In this case, the court charged the jury with deciding, *inter alia*, whether Plaintiff had proven (1) that "she engaged in protected activity," (2) that "Defendant terminated her employment," and (3) that "there was a causal link between her protected activity and the termination of her employment." (Jury Instr. [89], at 21.)[2]  Defendants argue that no reasonable jury could have found that Plaintiff engaged in protected activity.  In the alternative, they argue that no reasonable jury could have found a causal link between her protected activity and her termination.  The court considers these arguments in turn.   In doing so, it "construes the evidence strictly in favor of the party who prevailed before the jury."  *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012).

**a.     Protected Activity**

Title VII "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1115 (2017).  Complaining about the actions of a coworker in the workplace can reasonably be described as "opposing" an employment practice, but not all such complaints qualify as opposition to an *unlawful* employment practice.  "Complaining about a co-worker's actions is not statutorily

---

[2]       The court further instructed the jury that "[e]ngaging in 'protected activity' means that an individual has opposed an unlawful employment practice," and that a plaintiff claiming retaliation not only must "have a subjective (sincere, good faith) belief that she opposed an unlawful practice," she also must have had a basis for this belief that was "objectively reasonable, which means that the complaint must involve a violation of the law."  (Jury Instr. 22.)  Plaintiff's complaints need not "have included any 'magic words' such as 'sex discrimination' or 'sexual harassment'" to qualify as protected activity, "so long as the complaint indicate[d] that the discrimination occurred because of the plaintiff's sex, race, national origin, or some other protected class."  (*Id.*)

protected expression when the complained-of conduct does not relate to" prohibited discrimination. *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014). Although the complaining party "need not show that the practice he opposed was in fact a violation of the statute," *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011), in order to qualify as protected conduct, the employee's complaint must be "based on a good-faith (that is, honest) and reasonable belief that it is opposition to a statutory violation." *Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 747 (7th Cir. 2010). "The objective reasonableness of the [plaintiff's] belief is not assessed by whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Lord*, 839 F.3d at 563 (quoting *Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766, 771 (7th Cir. 2008)).

In this case, Plaintiff's brief exposure to what she believes was pornography likely does not amount to actionable sex discrimination. *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007) (strongly suggesting that a single co-worker "watching pornography on his office computer" would not, without more, support a claim for a sexually hostile work environment). But Plaintiff never claimed that it did. She instead argues that her complaints qualify as protected conduct for purposes of a retaliation claim, because pornography "is sex-based and demeaning to women" and therefore *could* create a work environment that is sexually hostile "if displayed often enough." (Pl.'s Resp. Br. 2.)

Defendants argue that, as a matter of law, a woman's complaint about coworkers exposing her to pornography cannot qualify as protected conduct unless she reasonably believed that her coworkers (a) "directed" the pornography at her, and (b) did so because of her sex. (*See* Defs.' Renewed Mot. 4-12.) In support of their position, Defendants point to *Orton-Bell v. Indiana*, where the Seventh Circuit concluded that a woman who complained about "night-shift employees" having sex on her desk did not engage in protected conduct. 759 F.3d 768, 776 (7th Cir. 2014). The plaintiff offered no evidence that the night-shift employees were using her desk for sex *because* she was a woman, the court explained. *Id.* Nor did she present any evidence that she

had "rooted her complaint in the fact that she was a woman." *Id.* Her complaint about employees having sex on her desk was "undoubtedly valid," but it did not "indicat[e] a connection to a protected class or provid[e] facts sufficient to create that inference." *Id.* (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). The court therefore affirmed summary judgment for the defendant.

The Seventh Circuit followed similar logic in *Lord v. High Voltage Software, Inc.*, 839 F.3d 556 (7th Cir. 2014). In that case, a male plaintiff complained to his employer that his male coworkers were teasing him about the plaintiff's supposed romantic interest in a female coworker. *Id.* at 559. He also complained that, on four occasions, his male office-mate had "poked" or "slapped" the plaintiff's buttocks as he walked past. *Id.* at 559. Both the plaintiff and his office-mate were subsequently terminated, and the plaintiff filed suit for sexual harassment and retaliation. The district court granted summary judgment for the defendant on plaintiff's retaliation claim, and the Seventh Circuit affirmed. "[A]lthough [the plaintiff's] complaints concerned workplace banter and conduct that had sexual overtones," the court explained, "no evidence suggests that he was harassed because of his sex." *Id.* at 563. The plaintiff's "belief that he was complaining about sexual harassment, though perhaps sincere, was objectively unreasonable." *Id.*

Finally, Defendants note this court's recent decision in *Isbell v. Baxter Healthcare Corp.*, 273 F. Supp. 3d 965 (N.D. Ill. 2017). In that case, a female plaintiff claimed that her employer fired her because she complained about two occasions when male coworkers made jokes about erectile dysfunction in her presence. *Id.* at 970. She also complained that one of those coworkers—a "senior director of new product development" who had previously developed a marketing campaign for the erectile-dysfunction drug Cialis—made her feel "very uncomfortable" by decorating his office with various items of "Cialis paraphernalia" (none of which displayed genitalia) and regularly talking about Cialis during meetings. *Id.* The plaintiff argued that these complaints were protected conduct, but the court disagreed. "References to the marketing of an

erectile dysfunction drug, even if repeated and irrelevant, are not inherently sexual harassment," the court explained. *Id.* at 980. And Isbell had made "no showing" that the senior director's Cialis paraphernalia, or his comments about Cialis during meetings, were "directed at Isbell herself, or at females in general." *Id.* Nor had she offered any evidence that her coworkers made jokes about erectile dysfunction in her presence because of her sex, or that she "even believed that was the case." *Id.* The plaintiff's belief that she was subjected to a sexually hostile work environment was therefore objectively unreasonable and her complaints were not protected conduct. In granting summary judgment for the defendant, however, the court noted that even if plaintiff engaged in protected activity, it was not clear that the person who made the discharge decision was aware of that activity, and the discharge decision was "amply supported by complaints from co-workers" about plaintiff's job performance. *Id.* at 982, 986.

In Defendants' view, these cases stand for the principle that a plaintiff's complaint about her coworkers' actions can *never* be objectively reasonable for purposes of a retaliation claim under Title VII unless the persons engaging in the complained-of conduct (1) intentionally targeted the plaintiff or another individual, and (2) did so because of that person's membership in a protected class. Under this interpretation, Defendants would be correct that Lynn Sanchez's complaints were not protected. She presented no evidence that her coworker watched pornography in the parish supply room with the intent of showing it to her or to anyone else. Nor did she present any evidence that Ms. Sanchez's coworker exposed her to pornography because she is a woman.

But Defendants misread the law. True, where harassment is directed at an individual, a hostile work environment is more likely to result; thus, a complaint about such conduct is more likely to be deemed objectively reasonable because the complained-of conduct is more likely to have made the workplace intolerable for the individual who was targeted. *Cf. Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1010 (7th Cir. 1994) ("[I]t is a lot more uncomfortable to be the target of offensive words and conduct than to be merely an observer of them."). But this does not mean

that there can be no hostile work environment without a showing that the plaintiff was targeted, *see Yuknis*, 481 F.3d at 554 ("[O]ne could be in the target *area* because a group of which one was a member was being vilified, although one was not singled out.") Nor must a plaintiff show her complaints were about conduct targeted at her. A person could honestly and reasonably believe that the actions of her coworkers, even if not directed at her or any specific individual, created a hostile work environment.

The case law cited by Defendants does suggest that the work environment about which a plaintiff complains must be objectionable because of its depiction of, or effect on, a protected class in order for the complaint to qualify as protected conduct. *See Tank*, 758 F.3d at 809 (complained-of conduct must "relate to" prohibited form of discrimination); 29 C.F.R. § 1604.11(a)(3) ("[V]erbal or physical conduct of a sexual nature constitute[s] sexual harassment when . . . (3) such conduct has the purpose *or effect* of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.") (emphasis added). They also stand for the principle that the complaints themselves must "indicat[e]" this "connection to a protected class or provid[e] facts sufficient to create that inference." *Orton-Bell*, 759 F.3d at 776 (quoting *Tomanovich*, 457 F.3d at 663).

Defendants argue that Ms. Sanchez's complaint about her coworker watching pornography in the workplace was not sufficiently connected to her sex to qualify as protected conduct. They characterize it instead as a complaint about actions that Plaintiff found *personally* objectionable. Like the plaintiffs in *Orton-Bell*, *Lord*, and *Isbell*, Defendants suggest, Sanchez complained about "disgusting" conduct, but not conduct that was objectionable because of its effect on women. (*See* Defs.' Mot. 7 (quoting *Orton-Bell*, 759 F.3d. at 776).)

This court does not find the analogy to *Orton-Bell* or any of Defendants' other cases compelling. Plaintiff Sanchez did not complain about the presence of sexual banter or activity in the workplace, as the plaintiffs did in *Orton-Bell*, *Lord*, and *Isbell*. She complained about the presence of pornography in the workplace. Sexual intercourse and references to sexual

intercourse in the workplace are not necessarily more objectionable to women than they are to men. But pornography might be. *See, e.g.*, *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) ("[T]he mere presence of pornography in a workplace can alter that 'status' of women therein and is relevant to assessing the objective hostility of the environment."); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (distinguishing a "merely unpleasant working environment" saturated with, e.g., "vulgar banter, tinged with sexual innuendo," from a "hostile or deeply repugnant" work environment saturated with, e.g., "pornographic pictures"); *Yuknis*, 481 F.3d at 555 (suggesting, in dicta, that a workplace where "pornographic pictures were exhibited on the walls" might be sufficiently hostile to women to support a claim under Title VII); *Rodrick v. St. Joseph Coll.*, No. 2:05-cv-274, 2008 WL 1925072, at *6-7 (N.D. Ind. Apr. 30, 2008) (complaint about coworker viewing pornography at work was protected conduct for purposes of retaliation claim); *Moore v. INX, Inc.*, No. 11-cv-1108 CAB (MDD), 2013 WL 12095164, at *10 (S.D. Cal. June 10, 2013) (same).

Ms. Sanchez's two brief observations of a coworker watching what she believed was pornography may not be enough to establish a hostile work environment claim. *See id.* But being exposed to pornography in the workplace is "the type of occurrence that, if it happened often enough, *could* constitute sexual harassment." *Magyar*, 544 F.3d at 772 (emphasis added). The presence of pornography in the workplace therefore falls within "the category of conduct prohibited by the statute," *id.* at 771, and a reasonable jury could find that Plaintiff's initial, good-faith complaint was protected conduct for purposes of her retaliation claim.

So too with Plaintiff's subsequent complaints about what she believed to be Defendants' inadequate investigation of her original report. An employer's negligent failure to take reasonable steps to discover or remedy harassment can be actionable under Title VII. *See Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). A person who complains about what she honestly and reasonably believes to be her employer's negligent investigation into sexual harassment engages in protected conduct because she is opposing "the category of conduct prohibited by the statute,"

16

*Magyar*, 544 F.3d at 771. To find that Sanchez's complaints about the investigation were protected, therefore, the jury needed evidence that Plaintiff honestly and reasonably believed that her employer failed to take reasonable steps to discover or remedy the behavior she identified in her original complaint.

At trial, Plaintiff presented evidence of several circumstances that led her to believe Defendants' response to her initial complaint was inadequate. Father Larry Lisowski admitted that he did not report her allegation to the Archdiocese's Office of Employee Services or Office of Legal Services, which the Archdiocese's personnel manual arguably required him to do. Instead, he told Mark Besztery to investigate her complaint. According to Plaintiff, Besztery then told her that he, Cherie May, and Harry Costaldo would have a meeting, during which they would check whether the relevant computer had been used to access inappropriate content. Before this meeting was scheduled to occur, however, she observed May and Costaldo enter the computer room without Besztery. When she told Besztery about this, he acknowledged their conduct was "strange." Based on these events, Plaintiff concluded that Cherie May's assurances about Costaldo not having viewed pornography were unreliable, and that Defendants' willingness to accept those assurances at face value made it more likely that she and other women at the parishes would be exposed to sexually offensive content in the future.

Defendants do not suggest that Plaintiff complained about the investigation in bad faith. Instead, they argue that "[u]nder controlling case law, [their] response to Plaintiff's report of purported pornography was both reasonable and effective," and that Plaintiff's belief to the contrary was therefore objectively unreasonable. (Defs.' Reply Br. [115], at 15.) The first part of Defendants' argument is likely true. Even if Father Larry Lisowski did not adhere to the letter of Defendants' sexual harassment policy, an employer's "failure to follow internal policy does not matter so long as the employer's response is otherwise reasonable under Title VII." *Milligan v. Bd. of Trustees of Southern Illinois Univ.*, 686 F.3d 378, 387 (7th Cir. 2012). And the remainder of Defendants' response appears to have been reasonable under the circumstances. Defendants

reported Plaintiff's complaint about Costaldo to his supervisor, Cherie May. Besztery received assurances from May—supported by documentation—that Costaldo had not, in fact, viewed pornographic content on the parish computer. Even with these assurances, Besztery took further steps to prevent Costaldo from being alone with Plaintiff. It is unlikely that the law required Defendants to take the additional steps Plaintiff believed were required—hiring a third party to investigate Costaldo's web-browsing habits and/or terminating the parish's contract with MayDay Solutions entirely—particularly as Defendants had no reason to believe that Costaldo or anyone else continued to view inappropriate content at work. *See Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014) ("Title VII requires only that employers take action reasonably calculated to stop unlawful harassment; that requirement does not necessarily include disciplining the employees responsible for past conduct.").

Yet the fact that Defendants' investigation was not actually unlawful does not make Plaintiff's belief that she was opposing unlawful conduct unreasonable *per se*. *See Pickett v. Sheridan Health Care Center*, 610 F.3d 434, 441 (7th Cir. 2010) (rejecting employer's argument that "a plaintiff demonstrate actual employer liability for conduct that may motivate her complaint before the plaintiff could recover for a retaliatory firing based on such a complaint"). Nor was her belief unreasonable merely because she was not actually exposed to additional pornography after she complained. That fact is relevant to the reasonableness of her belief about the adequacy of Defendants' response, but it is not determinative. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (reasonableness of employer's response cannot be determined "solely" based on "whether the remedial activity ultimately succeeded") (citation omitted).[3]

---

[3] Defendants also cite *Clemmer v. Office of Chief Judge of Circuit Court of Cook County*, No. 06 C 3361, 2009 WL 765303 (N.D. Ill. March 23, 2009) (Aspen, J.), for their suggestion that the actual effectiveness of Defendants' response makes Plaintiff's belief objectively unreasonable. But *Clemmer* is inapposite. The court in that case considered whether the defendant's alleged failure to investigate the plaintiff's complaint about sexual harassment was itself a materially adverse employment action for purposes of the plaintiff's retaliation claim. *See id.* at *3. There is no question that Sanchez suffered a materially adverse action in this case—she was fired. The relevant question is whether her belief that Defendants' investigation was unlawfully deficient was itself unreasonable. The answer to that question does not turn on

The evidence presented at trial would allow a reasonable jury to conclude that Plaintiff complained about deficiencies in their response to her report of pornography in the workplace. Even if such deficiencies were not severe enough to hold Defendants vicariously liable, the jury could reasonably infer that these deficiencies made it significantly more likely that Plaintiff and other women at the parishes would be exposed to sexually offensive content in the future. Such deficiencies fall within "the category of conduct prohibited by the statute," *Magyar*, 544 F.3d at 771, and Plaintiff's good-faith complaints about those deficiencies therefore qualify as protected conduct.

### b.    Causation

To prevail on her retaliation claim, Plaintiff had to show that her protected conduct was "the but-for cause" of her termination. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (quoting *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

In the court's view, Plaintiff's evidence of causation is sufficient. Defendants note that Plaintiff was fired nearly seven months after she first complained about Costaldo's viewing pornography, and they suggest that such a lengthy gap between the two events precludes a finding of the requisite causal link between them. This might well be true if temporal proximity were the only evidence linking Plaintiff's original complaint to her termination. *See, e.g.*, *Young-Gibson v. Bd. of Education of City of Chicago*, 558 Fed. App'x 694, 699 (7th Cir. 2014) (seven-month delay between protected conduct and adverse action precluded inference of causation "based on 'temporal proximity' alone"). But temporal proximity was not the only evidence of causation Plaintiff presented at trial. Plaintiff testified that, during her phone call with Mark Besztery on November 9, Besztery told her that "if you can't let this go, you can turn in your keys

---

whether the purported deficiencies in the investigation materially altered the conditions of Plaintiff's employment, thereby satisfying the adverse-action element of a retaliation claim.

on Monday." Even if the court assumes that Besztery was referring to Plaintiff's repeated complaints about the investigation, rather than her initial complaint about pornography, the comment still suggests that Plaintiff's original complaint was the "but-for" cause of her termination. But for Plaintiff's original complaint, Defendants would not have conducted the allegedly deficient investigation that Plaintiff refused to "let go."

In any event, Plaintiff's subsequent complaints about the investigation were also protected conduct, and the evidence linking those complaints to Plaintiff's termination is far stronger. Both Plaintiff and Mark Besztery testified that they were talking about the investigation on both November 7 and November 9, the day before Plaintiff was terminated. Defendants suggest that the jury could not reasonably infer a retaliatory motive from this temporal proximity, because Plaintiff had been complaining about the investigation for months by that point and has offered no "valid reason why her final complaint 'would suddenly trigger retaliation.'" (Def.'s Reply Br. 18 (quoting *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011)). The court does not think such an explanation is necessary, in light of Besztery's clear warning to Plaintiff on November 9 that "if you can't let this go, you can turn in your keys on Monday." But even if an explanation of what "suddenly trigger[ed] retaliation" were necessary, the jury could have reasonably inferred one from the notes Kim O'Donoghue took during her November 10 phone calls with Besztery, which indicated that Sanchez was now "threatening to go public."

Defendants also argue that they terminated Plaintiff because she verbally and/or physically abused Besztery on November 7 and 9, not because she complained about the investigation. To prevail on her retaliation claim, Plaintiff needed to provide evidence that this legitimate, nondiscriminatory reason for her termination was pretextual. *Coleman v. Donahoe*, 667 F.3d 835, at 852 (7th Cir. 2012).

Plaintiff did offer such evidence: she testified that she never touched, swore at, or spit on Besztery during her conversations with Mark Besztery on November 7 and 9. Defendants suggest that Plaintiff was "merely disagreeing" with her employer about whether her conduct warranted

termination, which would not "meet the standard for proving pretext." (Defs.' Mot. 19 (citing *Tibbs v. Admin. Office of the Illinois Courts*, 860 F.3d 502, 506 (7th Cir. 2017).).   But this mischaracterizes what Plaintiff said at trial.   She denied that the conduct Defendants cited as the basis for her termination occurred at all.   A reasonable jury could have found her testimony more credible than Besztery's, and inferred that Besztery concocted a story about "verbal abuse" as a pretext for retaliation.   *See Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017) ("Evidence that an employer lied about the reasons for an adverse employment action permits a trier of fact to infer that the decision was actually motivated by discriminatory animus.")   The jury also could have drawn such an inference from Besztery's shifting explanation for the termination in his phone conversations with Kim O'Donoghue on November 10 and his e-mail to her the next day.   *See Coleman* 667 F.3d at 52-53 (finding of pretext can be based on "weaknesses, implausibilities, inconsistencies, or contradictions" in employer's proffered non-discriminatory rationale).

Because the jury had a legally sufficient evidentiary basis to find (1) that Plaintiff engaged in protected activity, and (2) that her protected activity caused Defendants to terminate Plaintiff's employment, Defendants' renewed motion for judgment as a matter of law is denied.

## II.    Remittitur

Defendants also move for remittitur pursuant to Rule 59(e).   The jury awarded Plaintiff $200,000 in compensatory damages and $500,000 in punitive damages; Defendants argue that both these awards were "excessive" and/or "inappropriate."   The court considers the awards in turn.

### a.    Compensatory Damages

In reviewing an award of compensatory damages, courts "typically ask: (1) whether the award is 'monstrously excessive'; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is comparable to those in similar cases."   *Marion County Coroner's Office v. EEOC*, 612 F.3d 924, 930-31 (7th Cir. 2010).

An award of $200,000 is neither "monstrously excessive" nor without any rational connection to the evidence presented at trial. Multiple witnesses testified to the centrality of the church to Plaintiff's social and spiritual life prior to her termination. Those witnesses also identified specific ways in which Plaintiff's behavior and mood changed after she was fired. She stopped participating in activities she had previously enjoyed, had difficulty sleeping, gained weight, and lost touch with friends. Although it does not appear that plaintiff sought professional help for any mental health problems stemming from her termination, "[m]edical support is not necessary to prove emotional injury in a Title VII case." *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). It is inherently difficult to place a monetary value on emotional distress, and "[e]valuating issues as subjective and elusive as emotional damages is a task [courts] leave in the first instance to the common sense and collective judgment of juries." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 388 (7th Cir. 2011). There is no evidence in this case that the compensatory damages award was "a product of the jury's fevered imaginings or personal vendettas." *Farfaras*, 433 F.3d at 566.

To be sure, the award is higher than the Seventh Circuit has deemed appropriate in some Title VII cases. In *Schandelmeier-Bartels*, for example, the court reduced a (white) Title VII plaintiff's compensatory damages from $200,000 to $30,000, because she "did not testify to any lasting physical or emotional effects" resulting from either her termination or her (black) supervisor's "racist tirade." 634 F.3d at 389. She also testified that she found a new job a mere ten days after being terminated by the defendant. *Id.* Similarly, in *Marion County Coroner's Office*, the court reduced the plaintiff's compensatory damages from $200,000 to $20,000, because the jury heard "extremely brief" testimony about emotional injury, which indicated only that the plaintiff—who was fired from a "political post" because of his race and in retaliation for filing an internal complaint—underwent "'[w]eekly therapy sessions for '[s]everal months' for '[s]ituational depression.'" 612 F.3d at 21.

Plaintiff Sanchez presented more evidence of emotional distress than the plaintiff in either of these cases. She also identified a plausible reason why her distress might be more severe than that experienced by others who are terminated from their jobs: Plaintiff not only lost an income stream, she suffered significant damage to her religious and social life, both of which revolved around the church.

Where the circumstances warrant it, the Seventh Circuit has upheld compensatory damage awards similar to the one in this case. *See, e.g.*, *Farfaras*, 433 F.3d at 566-67 (where witnesses testified that plaintiff "lost self-esteem, gained weight, had problems sleeping, changed demeanor, and became nervous," district court acted within its discretion by upholding jury award of $200,000 for emotional injury, despite lack of medical evidence, because the award "was roughly comparable to previous awards"); *Deloughery v. City of Chicago*, 422 F.3d 611, 619-21 (7th Cir. 2005) (district court acted within its discretion by remitting jury's award of $250,000 for emotional distress to $175,000 for plaintiff who testified she was "devastated" when she was denied a promotion). Because "[i]t is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress," *Tullis v. Townley Engineering & Mfg. Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001), and because this court does not see a compelling reason to second-guess the jury here, Defendants' motion is denied with regard to compensatory damages.

### b. Punitive Damages

The punitive damages award presents different concerns. Under 42 U.S.C. § 1981a(b), a plaintiff seeking damages for a violation of Title VII may recover punitive damages only where the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." "The very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999). Where, as here, the defendant has more than 500 employees, the compensatory and punitive damages awarded for Ms. Sanchez's federal claims may not exceed $300,000. 42 U.S.C. § 1981a(b)(3)(D).

Ms. Sanchez has also brought claims under the Illinois Human Rights Act, and her damages could be attributed to those state court claims, effectively lifting the cap. The court nevertheless concludes that an award of $500,000 is inappropriate under the circumstances in this case. Although Defendants ultimately terminated Plaintiff unlawfully, there is little evidence that they did so maliciously. In *Gracia v. SigmaTron International, Inc.*, for example, the Seventh Circuit determined that a $250,000 punitive damages award was appropriate because the defendant attempted to "hide the true nature of the [plaintiff's] discharge" by "creating a false paper trail that included manufactured details of reports and meetings[.]" 842 F.3d 1010, 1025 (7th Cir. 2015). Nothing like that occurred in this case. Mark Besztery's clumsy attempt to establish multiple non-discriminatory reasons for Plaintiff's termination is enough for the jury to infer pretext, and to support a small punitive damages award. But it does not rise to the level of a coordinated effort to manufacture false evidence. Notably, Defendants' human resources personnel rejected Besztery's attempts to create a paper trail that suggested additional rationales for terminating Plaintiff.

The court concludes that remittitur is appropriate here and reduces the Plaintiff's punitive damages award to $50,000. Plaintiff will be free to accept the remittitur or proceed to a new trial on damages. *See McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391-92 (7th Cir. 1984).

## CONCLUSION

Defendants' Renewed Motion for Judgment as a Matter of Law, or in the Alternative for Remittitur [84, 102] is granted in part and denied in part. There was a sufficient evidentiary basis to support the jury's conclusion that Defendants retaliated against Plaintiff because of her protected conduct, so the court denies Defendants' motion for judgment as a matter of law. But the court grants Defendants' alternative motion and remits Plaintiff's punitive damages. Plaintiff is directed to advise the court within 14 days whether she will accept an award of punitive

damages in the amount of $50,000 or will request a new trial.  Plaintiff's motion *in limine* [75] is stricken as moot.

ENTER:

Dated:  November 27, 2018

_____
REBECCA R. PALLMEYER
United States District Judge